FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

IN THE UNITED STATES DISTRICT COURT

DEC - 7 2012

DISTRICT OF UTAH, CENTRAL  DIVISION

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | REPORT AND RECOMMENDATIONS |
| Plaintiff, | : | Case No.  2:12-CR-00025-TS |
| v. | : | |
| JESUS URIAS, | : | Magistrate Judge Robert T. Braithwaite |
| Defendant. | : | |

Before the Court is a Motion to Suppress Evidence submitted by defendant Jesus

Urias (Docket Entry No. 17.)  After thorough review and consideration of the evidence

and testimony presented at the evidentiary hearing and the parties' pleadings, the Court

recommends that defendant's Motion to Suppress Evidence be **DENIED.**

## FACTUAL BACKGROUND

Utah Highway Patrol ("UHP") Trooper Bronson Wood has nearly six years of law

enforcement experience and, since March 2011, has been assigned to the Criminal

Interdiction Team. (Transcript of 7/30/2012 Evidentiary Hearing at Page 6.)  In May

2012, Trooper Wood became certified as a K-9 police dog handler.  (Id.)  In addition to

K-9 handler school, Trooper Wood underwent 56 hours of regional criminal interdiction

training, including 16 hours of advanced interdiction training.  (Id. at 7.)  His assignment

includes performing a high volume of traffic stops in search of drugs, weapons,

outstanding warrants, and impaired drivers. (Id.) Trooper Wood estimated that he has conducted more than 6,000 traffic stops in his career and that seventeen traffic stops have resulted in significant drug quantity seizures. (Id. at 8, 19.) He further testified that in the larger drug seizures, he often found drugs in hidden compartments. (Id. at 8.)

On December 30, 2011, while patrolling Interstate 70, Trooper Wood received information from Brian Lacy, a UHP Trooper currently assigned as a Task Force Officer with the Drug Enforcement Administration ("DEA"), regarding a four-door Dodge pickup that may be involved in criminal activity. (Id. at 8-10.) Having known Lacy for a long time, and aware of Lacy's current assignment, Trooper Wood considered the tip reliable. (Id. at 10.) Just before noon, Trooper Wood observed the Dodge pickup speeding on Interstate 70. (Id. at 11.) The trooper initially estimated the vehicle's speed at 75 miles per hour in a 65 mile per hour zone. (Id.) Trooper Wood then activated his radar and obtained a reading of 70 miles per hour before observing the vehicle brake unusually quickly, dropping its speed to 55 miles per hour. (Id. at 11-12.) Trooper Wood is certified to operate radar, his radar unit was certified, and he had tested it to verify it was working properly that day. (Id. at 13-15; see also Pl. Ex. 1A, 1B.)

As the pickup passed him, Trooper Wood noticed the driver was oddly rigid and staring straight ahead, "almost like he [did]n't want to be seen." (Tr. at 13.) The trooper began following the truck, which traveled unusually slow–between 50 and 55 miles per hour. (Id. at 15.) Trooper Wood activated his lights and stopped the truck. (Id. at 16.)

Upon contacting the driver, Trooper Wood was overwhelmed by the odor of air freshener coming from inside of the vehicle. (Id. at 17.) Trooper Wood was suspicious

that the air freshener may be present to mask the odor of narcotics–a tactic he has seen from drug smugglers in the past–and he testified the odor in this vehicle was stronger than any he has encountered previously. (Id. at 17-18.) The trooper asked the driver about the odor, and the driver stated he bought two air fresheners in the nearby town of Beaver, Utah, and unwrapped both entirely. (Id. at 18.) He identified the driver, Jesus Urias, by his California driver license but noticed the truck was registered in Nevada. (Id. at 18-20.) Trooper Wood invited Urias back to his patrol car to complete the speeding violation paperwork. (Id. at 20.) Defendant asked if he could stand outside the patrol can, and Wood said he "...was okay with that." (20.)

Trooper Wood inquired about travel plans. Urias said he was headed to Colorado for New Year's but gave non-specific answers: the address he was going to was "left or something"; he planned to be gone for "two, three, or four days"; and his plans, once he reached Colorado, were "to eat lots of Mexican food." (Id. at 21-22.) Urias said he worked construction and needed to be back in a few days, but then he said he had been unemployed for two weeks. (Id. at 22-23.) Trooper Wood noticed Urias had registered the truck just nine days previously. This caught the trooper's attention because, in his experience, drug traffickers commonly register vehicles shortly before their trips. (Id. at 23-24.) Urias was unable to provide the name of the person who sold him the truck. (Id. at 24.) When asked about the addresses on driver's license and the truck registration, Urias said he goes back and forth between California and Nevada and admitted he had recently been released from prison for drug trafficking. (Id. at 24-25.) Urias could not recall his current address and gave the trooper two different street names. (Id. at 25.)

Trooper Wood issued a warning for speeding and then told Mr. Urias his story made little sense. (Id. at 27.) Trooper Wood asked Urias if he was involved in criminal activity before asking specifically about various drugs. (Id. at 28.) Urias denied involvement in criminal activity, but, in responding to the question about cocaine, Urias broke eye contact and looked away. (Id. at 28-29.) Trooper Wood then asked for permission to search the truck. (Id. at 29.) Urias gave verbal consent and then signed a written consent form, printed in both English and Spanish, in the presence of both Trooper Wood and assisting Trooper Elmer. (Id. at 29-31; see also Pl. Ex. 2.)

Trooper Wood began searching the truck and found a backpack with Urias's name on it. (Tr. at 34.) Inside the backpack, the trooper found a receipt from the Burlington Coat Factory in Aurora, Colorado, stamped less than 48 hours prior to the traffic stop. (Id.; see also Pl. Ex. 3.) A records check through dispatch revealed two open criminal investigations on Urias, one of which was for distributing cocaine less than a month before. (Tr. at 32-33.) Urias previously claimed he had not been to Colorado in the last six months and, when asked about the receipt, Urias had no explanation for it.[1] (Id. at 35.)

Trooper Wood found the interior of the truck in immaculate condition except for tool marks on the seat bolts and Bondo dust under the seats, which suggested some sort of repair or alteration to the cab of the truck. (Id. at 36-38.) Under the cab, Trooper Wood "could tell the driveline had been off just recently, the cross members had been off, and it had a fresh coat of paint from the back of the cab to the front of the cab." (Id. at 39.)

---

[1] In his memorandum, defendant incorrectly asserts that Trooper Wood did not question defendant about the receipt found in the vehicle. See Def. Mem. at ¶ 28; see also Tr. at 76.

Trooper Wood, who has a year-and-a-half experience working in automobile body repair, observed no indications of a collision significant enough to create damage in the area of the cab floor. (Id. at 36-37, 40.)  These observations led Trooper Wood to believe that the truck, which had only 40,000 miles on it, had been modified to create a hidden compartment. (Id. at 24, 39-40.)  Trooper Wood requested assistance and also asked for a scope to examine the contents of the gas tank. (Id. at 40-41.)

Sevier County Sheriff's Deputy Ernest Peterson responded to assist and brought his police service dog, Mick, with him to the scene. (Id.)  Trooper Wood had prior experience with Mick and found Mick to be reliable, never "indicating" in an area where drugs were not found and only failing to indicate in one instance where drugs were found in liquid form in a vehicle's windshield washer reservoir. (Id. at 41-42.)

Deputy Peterson deployed Mick, and Mick gave a positive indication on the side of the truck between the back of the cab and the gas tank lid.[2] (Id. at 43, 91.)  Deputy Peterson, a certified Narcotics Detection Dog Handler, has worked with Mick for four years. (Id. at 85.)  Mick was first certified in 2007 and most recently certified in 2010. (Id. at 85-86.)  Mick's certification expired in July 2011 and he officially retired from police work in July 2012 due to hip-related health problems. (Id. at 87-88, 93.)  Deputy Peterson and Mick trained together informally on a monthly basis totaling more than 100 hours per year; Mick proved highly reliable and had not made an error in training since

---

[2] Defendant suggests that the gas tank was "scoped" while the vehicle was on the side of the road and concludes no drugs were found in the area of the canine alert. (Def. Mem. at ¶ 33.) Although Trooper Wood testified generally that no drugs were found in the gas tank, see tr. at 74, he explained that he decided to move the vehicle to the service station for closer inspection rather than wait for the scope, which "was still 30 miles away." (Id. at 43.)

2010. (Id. at 89-90, 100). Deputy Peterson maintained records of Mick's ninety career deployments. (Id. at 90.) On only ten of those ninety deployments did Mick respond incorrectly: eight times indicating positively when no drugs were found and twice failing to indicate when drugs were later located. (Id. at 90-91.)

Mick's indication on defendant's truck strengthened Trooper Wood's suspicion of hidden drugs, and he told Mr. Urias he would be moving the truck to a service station in Richfield, Utah, for a more thorough search. (Id. at 43-44.) Urias neither objected nor asked why a more thorough search was needed. (Id. at 82.) Trooper Wood transported Urias to the service station and Trooper Elmer drove Urias's truck. (Id. at 44.)

During the search at the service station, Urias was not handcuffed or in custody. (Id.) As the officers searched, Urias went unescorted to a restaurant and bought food. (Id.) Urias told Elmer he was in no hurry and had "all day to wait." (Id. at 44-45.) As troopers removed seats from the truck, Urias asked how long the search would take but at no time asked officers to limit or stop the search. (Id. at 45, 82.)

The more thorough search revealed a fresh weld, approximately one-foot long, on the floorboard that had been partially ground down and painted. (Id. at 46.) Trooper Wood immediately knew the weld was unusual and unnecessary, and it focused his attention on the area of the floor near the transmission hump as the likely location of the hidden compartment. (Id. at 46-47.) He determined that the least intrusive means for exploring this area was by drilling a hole, a tactic he has used four or five times in the past and employs only when he is extremely confident a hidden compartment exists. (Id. at 47, 51.) In fact, every time Trooper Wood has drilled in search of a vehicle's hidden

compartment, he has found illicit drugs. (Id. at 51.)

Trooper Wood's first attempt to drill revealed two separate layers of sheet metal in the area, which was unusual and further strengthened his suspicion that the floor had been modified. (Id. at 47-48.) Trooper Wood drilled a second hole closer to the front of the truck and found a single sheet of metal as would be expected on an unmodified vehicle. (Id. at 48-49.) Trooper Wood had another officer assist by knocking on the undercarriage of the truck's transmission hump and the lack of vibration between the exterior and interior indicated a compartment or void. (Id. at 49-50.) He then drilled a third hole, this time closer to the rear of the truck, which penetrated a void. (Id. at 48-50.) Trooper Elmer inserted a camera into the third hole and passed the camera to Trooper Wood, who could see kilogram-sized packages consistent with packages of cocaine he has found in prior investigations. (Id. at 50.) The ten packages later tested positive for cocaine. (Id. at 50, 80) The trooper later discovered an access door to the compartment concealed as an air bag sensor under one of the seats. (Id. at 51.) He estimated the compartment, which ran the length of the truck's cab, at thirty inches wide and six inches deep. (Id. at 51-52.)

Troopers arrested Urias and transported him to jail. (Id. at 79.) DEA Task Force Officer Lacy later advised Urias of his rights and Urias agreed to be interviewed without an attorney present. (Id. at 105-06; see also Pl. Ex. 5.) Urias first told Lacy he was traveling to Colorado to sell his truck, but then confessed that a third party bought the truck, registered it in Urias's name, and told Urias to pick it up at a fast-food restaurant in Los Angeles. (Tr. at 107.) Urias said he was to be paid two-thousand dollars for delivering the truck to Denver and admitted he had been in Colorado two days before,

"making a test run." (Id. at 107-08.) Urias claimed he did not know precisely what he

was transporting but admitted he believed it was something illegal. (Id. at 108, 111.)

On March 12, 2011, defendant filed a Motion to Suppress Evidence. (Docket

Entry 17.) On July 30, 2012, this Court held an evidentiary hearing in St. George, Utah,

in which the government presented witnesses and exhibits. (See Minute Entry 32.) On

October 16, 2012, Mr. Urias filed a Memorandum in Support of Defendant's Motion to

Suppress, (file entry 38), and on November 13, 2012, the government filed its timely

response. (File Entry 39.)


## ANALYSIS

Defendant asserts that the evidence obtained against him should be suppressed

because 1) Trooper Wood unlawfully exceeded the scope of the traffic stop; 2) defendant

did not provide valid consent to search his vehicle; and, 3) the government cannot rely on

a drug alert by a police dog after its certification has lapsed.

### I. TROOPER WOOD DID NOT IMPERMISSIBLY EXCEED THE SCOPE OF THE TRAFFIC STOP.

Defendant argues that he was illegally detained because Trooper Wood exceeded

the scope of the traffic stop without reasonable suspicion to justify further investigation.[3]

In United States v. Villa-Chaparro, the Tenth Circuit explained,

_____

[3] Although in his conclusion defendant asserts "[t]hat the officer did not have sufficient grounds to detain defendants [sic]," (def. mem. at 17.), he makes no argument and offers no analysis in his memorandum suggesting the initial stop of his vehicle for a speeding violation was improper. Instead, defendant's challenge centers on the claim that Trooper Wood's detention of defendant became illegal after the purpose of the traffic stop was completed.

> Generally a police officer's actions during a detention must be reasonably related in scope to the circumstances which justified the initial stop. An investigative detention usually must last no longer than necessary to effectuate the purpose of the stop.  An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires "reasonable suspicion," of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.

115 F.3d 797, 801-02 (10th Cir. 1997)(citations and quotations omitted).

In assessing reasonable suspicion, the Court must base decisions not on any one factor, but on the "totality of the circumstances." United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995).  Courts must also defer to trained law enforcement personnel and their "ability to distinguish between innocent and suspicious circumstances." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.  Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

Id. (citing United States v. Cortez, 449 U.S. 411, 418 (1981)).  "The evaluation is made from the perspective of the reasonable officer, not the reasonable person." United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003)(emphasis original).

And, the reasonable suspicion standard is not a rigorous one:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from

information that is less reliable than that required to show probable cause. United States v. Tuter, 240 F.3d 1292, 1296 n.2 (10th Cir. 2001)(citing Alabama v. White, 496 U.S. 325, 330 (1990)).  In fact, "[a]s long as [the officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004)(emphasis in original).

Based on the totality of the circumstances, Trooper Wood had reasonable suspicion that defendant was engaged in criminal activity prior to asking questions regarding drug trafficking.  These circumstances include at least the following:

**1. Law Enforcement Tip.**  An anonymous tip, standing alone, will rarely provide reasonable suspicion for an investigatory stop.  Alabama v. White, 496 U.S. 325, 329 (1990).  As the Supreme Court has explained, however,

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances—the whole picture, that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable . . . . [We must take] into account the facts known to the officers from personal observation, and giv[e] the anonymous tip the weight it deserve[s] in light of its indicia of reliability as established through independent police work.

Id. at 330 (citation and quotation omitted).  And, "officers may pool their information and . . . reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved." United States v. Hinojos, 107 F.3d 765, 768 (10th Cir.

1997)(citing <u>United States v. Morgan</u>, 936 F.2d 1561, 1569 (10th Cir. 1991)).

Trooper Wood received a tip from fellow Trooper Brian Lacy that defendant's

truck may be involved in criminal activity.  (Tr. at 9.)  Trooper Lacy gave the vehicle's

description, license plate, and anticipated travel route but cautioned Trooper Wood to rely

on his own reasonable suspicion to stop the truck.  (<u>Id</u>.)  Trooper Wood has known

Trooper Lacy for a long time, knew of Lacy's current assignment with DEA, and

considered the tip reliable.  (<u>Id</u>. at 10.)  Moreover, Trooper Wood discovered the tip

accurately predicted that defendant's truck would be traveling eastbound on Interstate 70

that day.  (<u>Id</u>. at 10-11.)  The tip proved reliable and contributed to reasonable suspicion

of criminal activity beyond defendant's speeding violation.

   **2.  <u>Masking odor</u>.**  The Tenth Circuit has consistently held that "a strong odor

may give rise to reasonable suspicion on the part of law enforcement officials that the

odor is being used to mask the smell of drugs."  <u>United States v. Salzano</u>, 158 F.3d 1107,

1114 (10th Cir. 1998); <u>see</u> <u>also</u> <u>United States v. Villa-Chaparro</u>, 115 F.3d 797, 801 (10th

Cir. 1997)(explaining that the odor of soap and visible soap crystals contributed to

reasonable suspicion); <u>United States v. Hernandez-Rodriguez</u>, 57 F.3d 895, 898 (10th Cir.

1995)(noting that the strong smell of perfume supported reasonable suspicion it was being

used as a masking odor).

   Trooper Wood testified that strong odors in vehicles are suspicious because they

are often used to mask the presence of narcotics and that he frequently finds contraband

in vehicles with strong odors.  Here, Trooper Wood testified that the odor of air freshener

in defendant's vehicle was "overwhelming" and that he had "never smelled anything this

strong in any of the prior stops or pipeline [drug] arrests." (Tr. at 17-18.)  When the trooper asked defendant about the strong smell, he said he purchased two air fresheners in the last town he passed through and completely removed both wrappers. (Id. at 18.)  The presence of such a strong odor in defendant's vehicle supports a finding of reasonable suspicion for Trooper Wood to investigate further.

   **3. Recently Registered Vehicle.**  Defendant, who said he had been unemployed for two weeks, registered the truck just nine days prior to the traffic stop.  See United States v. Espinoza, 2007 WL 1018893 at *4 (D. Kan.) (unpublished)(finding evidence that a "vehicle was registered to defendant just three days prior to the traffic stop, which is common for drug organizations seeking to present the driver as a legitimate owner of the vehicle," contributed to reasonable suspicion); see also United States v. Berrelleza, 90 Fed.Appx. 361, 364 (10th Cir. 2004) (unpublished)(recently registered vehicle a factor in finding reasonable suspicion).  While of limited significance, the recency of defendant's vehicle registration is nevertheless a factor that contributes to reasonable suspicion.

   **4. Nervousness.**  Although not entitled to significant weight, "nervousness, even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded."  United States v. Johnson, 364 F.3d 1185, 1192 (10th Cir. 2004).  Trooper Wood testified that defendant appeared overly rigid, dramatically changed his speed, would not make eye contact, and seemed more nervous than the average motorist both before and during the stop.  (Tr. 12-13, 19-20.)  Such observations are relevant in the reasonable suspicion calculus.

**5. Vague, Inconsistent, or Evasive Answers.** Defendant first told Trooper Wood he was a construction worker and needed to be back to work in a few days but later stated he had been unemployed for about two weeks. (Tr. at 22-23.) Defendant did not know the name of the person that had sold him the truck just days earlier. (Id. at 24.) When asked for his current physical address, defendant was unable to provide it and gave two different street names. (Id. at 25.) When questioned about where he was headed, defendant described his brother's street address in Aurora, Colorado, as "left, or something," and said he planned to stay for "two, three, or four days." (Id. at 21.) When asked about what he would do while in Colorado, defendant stated, "eat lots of Mexican food," and then, after a long pause, concluded with a simple, "yeah." (Id. at 22.)

"Confusion about details is often an indication that a story is being fabricated on the spot." United States v. Santos, 403 F.3d 1120, 1131 (10th Cir. 2005). Defendant's vague, evasive answers about his travel plans support a finding of reasonable suspicion. Id. See also United States v. Simpson, 609 F.3d 1140 (10th Cir. 2010)(noting that evasive answers about travel plans, in conjunction with other factors, deserve weight in the reasonable suspicion determination).

**6. Criminal History.** "In conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus." United States v. White, 584 F.3d 935, 951 (10th Cir. 2009)(quoting United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005))(emphasis in original). "Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly

innocent behavior." Simpson, 609 F.3d at1147 (citing Santos, 403 F.3d at 1132).

Mr. Urias provided Trooper Wood with a California driver's license and a Nevada vehicle registration. When Trooper Wood inquired as to defendant's current address, he explained that "he had just gotten out of prison for drug trafficking and he stayed in Nevada." (Tr. At 25.) Mr. Urias volunteered information about his criminal record–including his recent release from prison for drug trafficking–that powerfully bolstered Trooper Wood's suspicions. See Simpson 609 F.3d at 1147, 1153.

These factors combined to give Trooper Wood reasonable suspicion to believe defendant was engaged in illegal activity. "Even where a particular factor, considered in isolation, is of 'limited significance,' it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion." United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007). Trooper Wood was not required to ignore these factors, and his "inquiry about drugs accounted for but a moment of defendant's brief detention and was based upon specific and articulable facts and rational inferences." United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986).

After dismissing his criminal history as "unremarkable," defendant argues that Trooper Wood detained him and sought consent to search "based upon a few statements that in the arbitrary opinion [sic] were unusual." (Def. Mem. at 9-10.) As shown above, however, numerous factors contributed to Trooper Wood's reasonable suspicion that Mr. Urias was engaged in criminal activity beyond the scope of the initial traffic stop–including a criminal history that could hardly be considered "unremarkable."

In United States v. Simpson, 609 F.3d 1140,1153 (10th Cir. 2010), the Tenth

Circuit upheld a finding of reasonable suspicion in what the Court described as "a close call." There, the Court relied on just three factors to conclude that the officer had a reasonable, articulable suspicion to detain Mr. Simpson: criminal history, extreme nervousness, and inconsistent travel plans.[4] Id. The Court found that these limited but articulable facts gave the officer "the right to briefly detain Mr. Simpson for further investigation." Id. As the Tenth Circuit emphasized, "[r]easonable suspicion is not, and is not meant to be, an onerous standard," and explained that "Mr. Simpson's record of prior criminal activity enhanced the suspicious nature of the other factors." Id.

As in the Simpson case, Trooper Wood observed defendant's nervousness, noted vague, evasive, and inconsistent answers to simple questions, and learned of Mr. Urias's recent release from prison for drug trafficking–which "enhanced the suspicious nature of the other factors" present. Unlike Simpson, however, this is hardly a close call. As shown above, Trooper Wood further considered a reliable tip received from law enforcement, a powerful masking odor coming from the vehicle, and the recency of defendant's vehicle registration. These numerous factors, considered in their totality and in light of Trooper Wood's experience, easily satisfy the less-than-onerous standard of reasonable suspicion required to briefly detain defendant for further investigation.

## II. DEFENDANT GAVE VALID CONSENT FOR TROOPER WOOD TO SEARCH HIS VEHICLE.

It is well settled that the Fourth Amendment prohibits warrantless searches unless they fall within certain exceptions to the warrant requirement. Schneckloth v.

---

[4] The Court gave little or no weight to the other factors considered, including the presence of certain items in the vehicle and an odd behavior by the police dog. Id. at 1152.

<u>Bustamonte</u>, 412 U.S. 218, 219 (1973)(quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)).  "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  <u>Id</u>. (citing <u>Davis v. United States</u>, 328 U.S. 582, 593-94 (1946)).

The Tenth Circuit analyzes consent issues by examining the totality of the circumstances surrounding the consent, with no presumption concerning the voluntariness or involuntariness of the consent.  <u>See, e.g.</u>, <u>United States v. Price</u>, 925 F.2d 1268, 1270 (10th Cir. 1991); <u>United States v. Soto</u>, 988 F.2d 1548, 1557 (10th Cir. 1993).  The government must establish voluntariness of consent to search by demonstrating that (1) the consent was unequivocal, specific, freely and intelligently given, and (2) that the consent was not the product of duress or coercion.  <u>See, e.g.</u>, <u>United States v. Orrego-Fernandez</u>, 78 F.3d 1497, 1505 (10th Cir. 1996).

Notably, defendant does not assert that he did not consent or that he withdrew or limited the scope of consent.  Instead, he challenges the validity of consent with the conclusory assertion that, because he was illegally detained, "any consent given was defective and did not give rise to a proper and legal search of the vehicle."  (Def. Mem. at 16.)  In essence, then, Mr. Urias seeks to re-argue reasonable suspicion in consent's clothing.  As demonstrated in Part I above, however, Trooper Wood had reasonable suspicion to justify briefly detaining defendant to investigate those suspicions further.  Moreover, in this brief period of detention, Mr. Urias expressly consented–both verbally and in writing–to a search of his vehicle.  (Tr. at 30-32; Pl. Ex. 2.)

**A. Defendant gave unequivocal consent to search his truck.**

-16-

When Trooper Wood asked if the defendant was involved in illegal activity, Mr. Urias said he was not. (Tr. at 28.) Trooper Wood then asked about Urias's involvement in trafficking specific drugs and defendant denied such activity. (Id.) Though Urias looked Trooper Wood in the eye when making most of those denials, he looked away when disclaiming involvement in trafficking cocaine. (Id. at 28-29.) Trooper Wood then asked Urias for consent to search his truck and he readily agreed. (Id. at 29.) Although Trooper Wood does not speak Spanish and defendant does not speak English perfectly, Trooper Wood had no difficulty communicating with Mr. Urias during the course of the traffic stop.[5] (Id. at 29-30.)

Though Mr. Urias had already offered verbal consent, Trooper Wood took the cautious step of presenting him with a written Consent to Search form that is printed in both English and Spanish. (Id. at 30-31; Pl. Ex. 2.) Defendant read the portion of the form written in Spanish aloud and then signed in the presence of both Trooper Wood and assisting Trooper Elmer. (Tr. at 31-32; Pl. Ex. 2.) Uncontradicted evidence makes clear that Mr. Urias freely, unequivocally consented to the search his truck.

### B. Defendant was neither coerced nor under duress when he gave Trooper Wood consent to search his truck.

Defendant does not argue that coercion or duress vitiated consent; rather, he suggests that, because he was unlawfully detained, his consent was not voluntary. As previously shown, Mr. Urias was not unlawfully detained at the time Trooper Wood

---

[5] Significantly, defendant does not argue that he failed to understand either the verbal request to search his vehicle or the Consent to Search form that he signed.

requested consent to search his truck. And, as demonstrated below, Mr. Urias was neither coerced nor under duress when he gave Trooper Wood consent to search his truck.

"Merely because a person is detained or in custody does not preclude voluntary consent." United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993)(citing Florida v. Royer, 460 U.S. 491, 501 (1983)). Indeed, a valid consent to search may be given by a person who is being detained, United States v. McRae, 81 F.3d 1528 (10th Cir. 1996); United States v. Soto, 988 F.2d 1548 (10th Cir. 1993), and it has been long established that subjects need not know or be told that they may refuse to give consent in order for consent to be valid. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).

Under the totality of circumstances, the evidence compels the conclusion that defendant's consent to search his truck was given voluntarily rather than a product of duress or coercion. See United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996). No other officers were present at the time Mr. Urias initially gave Trooper Wood consent to search. (Tr. at 31.) And, although Trooper Elmer was also present when defendant gave written consent to search, Urias was not physically harmed or touched; was not threatened; was not spoken to in a threatening tone or with a raised voice; no weapons were brandished; and the search commenced during daylight hours on the side of a public roadway. (Id. at 31-32.); see also Orrego-Fernandez, 78 F.3d at 1505. Mr. Urias voluntarily consented to the search in writing while lawfully detained and free from coercion or duress. His conclusory claim that consent was defective must therefore fail.

Furthermore, "[t]he general rule is that 'where a suspect does not limit the scope of

-18-

a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle.'" <u>United States v. West</u>, 219 F.3d 1171, 1177 (10th Cir. 2000)(quoting <u>United States v. Wacker</u>, 72 F.3d 1453, 1470 (10th Cir. 1995)).  There is no evidence before the Court to suggest Mr. Urias gave limited consent or that he objected to Trooper Wood's search while either roadside or at the service station.  The Court therefore finds that Trooper Wood's search of defendant's truck, both at the scene of the stop and at the service station, was lawfully conducted pursuant to valid consent.  However, even if this Court had found Trooper Wood exceeded the scope of consent by moving the truck to the service station for a more thorough search, the Court would nevertheless uphold the more thorough search based on probable cause.

### III.    TROOPER WOOD HAD PROBABLE CAUSE TO SEARCH DEFENDANT'S VEHICLE.

Defendant argues that Trooper Wood made no observations during his initial roadside search to justify moving the vehicle to a service station for a more thorough search. (Def. Mem. at 15-16.)  Defendant's analysis, however, ignores discovery of the receipt; dispatch reports regarding recent drug trafficking investigations implicating Mr. Urias; observations inside the truck's cab and beneath its undercarriage; and the alert of the police service dog.  Such observations early in the roadside search quickly established probable cause to search defendant's truck more thoroughly at the service station–even had defendant attempted to withdraw or somehow otherwise limit his consent.[6]

_____

[6] There is no evidence suggesting that defendant was taken into custody during the search or that he sought to withdraw or limit his consent in any way.  In fact, the evidence demonstrates

A warrantless search of an automobile does not violate the Fourth Amendment if there is probable cause to believe that the vehicle contains contraband, and officers may search the vehicle as thoroughly as a magistrate could authorize by warrant. United States v. Ross, 456 U.S. 798 (1982). The scope of such a search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." Id. at 824. As explained by the Tenth Circuit,

> Probable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed. The "totality of the circumstances" test does not depend on whether any particular factor is innocent when considered in isolation, but on whether, taken as a whole, the facts observed by law enforcement officers indicate a fair probability of criminal activity. Even where a particular factor, considered in isolation, is of "limited significance," it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion.

United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007)(citations and quotations omitted).

Under the totality of the circumstances of this case, Trooper Wood's reasonable suspicion of criminal activity quickly ripened into probable cause to search defendant's vehicle–rendering defendant's voluntary (and unwithdrawn) consent to search irrelevant. In addition to the reasonable suspicion factors set forth in Part I above, Trooper Wood observed the following soon after he began the roadside search of Mr. Urias's truck:

**1. Discovery of Receipt.** As he began his search of the pickup, Trooper Wood

---

quite the opposite: Urias was not in handcuffs while he waited at the service station; he went unaccompanied to a restaurant to purchase food while officers searched the truck; and, having already read and signed the Consent to Search form, defendant told Trooper Elmer, "I'm in no hurry. I've got all day to wait." (Tr. at 31, 44-45.)

located a backpack with the defendant's name on it.  (Tr. at 34.)  Inside the backpack,

Trooper Wood found a receipt from a store in Aurora, Colorado, showing a date and time

stamp of less than forty-eight hours prior to the traffic stop.  (Id.)  Mr. Urias had told

Trooper Wood he was enroute to Aurora, Colorado, and claimed he had not been there in

the last six months.  (Id. at 35.)  When questioned about the receipt, Urias claimed he did

not know about the receipt and had no idea how it ended up in his backpack.  (Id.)  The

receipt suggested defendant had not been simply vague or evasive in his answers to

simple questions but that he lied.

    **2.  Recent Drug Trafficking Investigations.**  Prior to commencing his search,

Trooper Wood requested dispatch check with the El Paso Intelligence Center ("EPIC")

database of ongoing criminal investigations.  (Tr. at 32-33.)  After commencing the

vehicle search, Trooper Wood was advised by dispatch that Mr. Urias was listed in two

open investigations in Colorado–his claimed destination on the current trip–including one

for cocaine distribution less than one month earlier.  (Id. at 33, 66.)  This information,

particularly when coupled with defendant's admission that he was recently released from

prison for drug trafficking, "contribute[d] powerfully" to the probability that Urias was

engaged in criminal activity.  See United States v. White, 584 F.3d 935, 951 (10th Cir.

2009)(quoting United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005)).

    **3.  Likelihood of Hidden Compartment.**  Trooper Wood's observations of the

defendant's truck–both inside the cab and beneath the undercarriage–strongly suggested

aftermarket modification to the cab unrelated to accident repair.

    In Jurado-Vallejo I, the Tenth Circuit clarified the probable cause inquiry where,

as in the instant case, the officer suspects a vehicle contains a hidden compartment:

> Whether probable cause to search a vehicle can be based on evidence of a
> hidden compartment depends on two factors: (1) the probative value of the
> evidence—that is, the likelihood that there really is a hidden compartment;
> and (2) the likelihood that a vehicle with a hidden compartment would, in
> the circumstances, be secreting contraband.

United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004).  With respect to

the second factor, the Court expressed the "common sense" observation that "it is hard to

conceive of a legitimate use for a large hidden storage compartment in any vehicle."  Id.

Thus, the focus of the analysis is the likelihood, based on the officer's observations, that a

hidden compartment exists in the vehicle.

And, in Jurado-Villejo II, the Tenth Circuit reversed the district court's granting of

the motion to suppress, noting that if the lower court found the officer's testimony

credible, probable cause to search existed.  United States v. Jurado-Villejo, 380 F.3d

1239, 1241 (10th Cir. 2004).  The Court elaborated:

> The issue is not whether [the officer] could have done more to confirm that
> the vehicle had a hidden compartment.  None of the opinions cited by the
> district court said that visual observations must always be corroborated by
> touch, smell, or the like.  Probable cause exists when the evidence would
> warrant a person of reasonable caution to believe that evidence of a crime
> will be found at the place to be searched. [The officer]'s observations would
> warrant a reasonable belief that the vehicle contained a hidden compartment.
> And on the facts of this case, as we said before, if the vehicle had a hidden
> compartment, it was highly likely to contain contraband.

Id. at 1241-42 (internal quotations and citations omitted)(emphasis added).

Before he moved the vehicle from the scene of the traffic stop, Trooper Wood

reasonably believed the defendant's truck contained a hidden compartment.  Trooper

Wood inspected the vehicle's interior.  (Tr. at 36-40.)  He found the pickup, which

showed just 40,000 miles, to be "in immaculate condition" with no sign of significant damage from a collision.[7]  (Id. at 36-37.)  Nevertheless, the trooper, who has experience in automobile body repair, discovered "Bondo dust" in the area of the seat frames indicative of body work on an apparently undamaged vehicle.  (Id.)  Trooper Wood also observed tooling marks on the seat frame bolts, suggesting the seats had recently been removed and re-installed.  (Id. at 38.)

When he examined the truck's undercarriage, Trooper Wood saw indications that all major components–including the drive-line, cross-members, transmission, and muffler–had all been taken off and re-installed.  (Id. at 39.)  He also observed the underside of the cab had a fresh coat of white paint from front to back.  (Id.)  These observations caused Trooper Wood to believe "there's a compartment manufactured in the transmission hump or the back wall of this vehicle."  (Id. at 39-40.)

Trooper Wood's roadside "observations would warrant a reasonable belief that the vehicle contained a hidden compartment."  Jurado-Villejo II, 380 F.3d at 1241-42.  Of course, "if the vehicle had a hidden compartment, it was highly likely to contain contraband."  Id.  And, although "visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search,"  United States v. Ledesma, 447 F.3d 1307, 1317 (10th Cir. 2006)(citing Jurado-Vallejo II)(emphasis

---

[7] Trooper Wood also testified that a collision resulting in significant damage to a truck's cab area usually results in the vehicle being considered "totaled," which would be reflected on the registration if repaired and put back into service but that defendant's nine-day-old vehicle registration did not so indicate.  (Tr. at 39.)  Trooper Wood also closely inspected for tell-tale signs of collision repair, including alignments on doors, door jambs, the bed of the truck, and so forth, none of which suggested the need for collision repair to the cab floor.  (Id. at 40.)

added), Trooper Wood made several other observations that increased the probability that Mr. Urias was involved in criminal activity.

**4. <u>Police Dog Alert</u>.** In addition to his personal observations, Trooper Wood had Deputy Peterson deploy a police dog to check defendant's truck for the odor of narcotics. (Tr. at 40-41.) Deputy Peterson responded to the scene of the traffic stop and deployed police canine "Mick." (<u>Id</u>. at 42-43.) Mick gave a positive indication for the odor of narcotics on defendant's truck in the area of the gas tank lid, which further strengthened Trooper Wood's suspicion that defendant's vehicle contained contraband. (<u>Id</u>. at 43, 91.) Trooper Wood determined that a more thorough search of the vehicle was required and moved defendant's truck to a service station in Richfield, Utah. (<u>Id</u>. at 43.)

When a trained police dog alerts on a vehicle, there is probable cause "to search the vehicle without a warrant under the automobile exception even had there been no prior consent." <u>United States v. Klinginsmith</u>, 25 F.3d 1507, 1510 (10th Cir. 1994); <u>see also</u> <u>United States v. Kennedy</u>, 131 F.3d 1371, 1378 (10th Cir. 1997)(noting that "[t]his court has consistently held that probable cause can be based on alerts by trained dogs"). Of course, "a dog alert might not give probable cause if the particular dog had a poor accuracy record." <u>United States v. Ludwig</u>, 10 F.3d 1523, 1528 (10th Cir. 1993). The Tenth Circuit has explained that, "[w]hile successful completion of a training course and a current certification would be satisfactory, we do not exclude the possibility that reliability can be established by other evidence." <u>United States v. Clarkson</u>, 551 F.3d 1196, 1204 (10th Cir. 2009). And, the court has expressly held that a police canine demonstrating "a 70-80% success rate meets the liberal standard for probable cause"

under controlling case law. <u>Kennedy</u>, 131 F.3d at 1378.

It is uncontested that Mick alerted on defendant's vehicle, and the evidence before this Court makes clear Mick is a trained, reliable narcotics detection canine. In 2007, Deputy Peterson was certified as a Narcotics Detector Dog Handler, and Mick was certified as a Narcotics Detector Dog, by Utah's Peace Officer Standards and Training, or "POST." (Tr. at 84-85; Pl. Ex. 4.) The certification process for Deputy Peterson and for Mick involved reality-based testing. (Tr. at 85.) The Handler and Dog tested together as a team; they certified (and re-certified) together with neither passing unless the other did. (<u>Id</u>. at 84-87) Mick was never unsuccessful in a certification attempt. (<u>Id</u>. at 87.) Mick was most recently certified by POST on July 28, 2010, and his certification remained valid for one year. (<u>Id</u>. at 86; Pl. Ex. 4.)

Deputy Peterson and Mick engaged in reality-based training exercises each month, totaling more than 100 hours annually, and this regular training continued beyond Mick's lapse in certification on July 28, 2011. (Tr. at 88-89.) During hundreds of hours of training each year, Mick proved highly reliable, properly locating all concealed drugs and only once giving a false alert on a non-drug item (latex gloves) which subsequent training corrected. (<u>Id</u>. at 89.)

In his career as a Narcotics Detector Dog, Mick has been deployed by Deputy Peterson ninety times. (<u>Id</u>. at 90.) Of those ninety deployments, Mick alerted to the presence of drugs thirty-three times. (<u>Id</u>.) Of Mick's thirty-three alerts, just eight were considered "false"; of the fifty-seven non-alerts, only twice were drugs later discovered. (<u>Id</u>. at 90-91.) In other words, Mick properly located drugs more than 75% of the time

-25-

and missed drugs less than 4% of the time, demonstrating a total overall success rate of eighty out of ninety career deployments, or roughly 89%.  By all measures, Mick has a record of training and real-world reliability well above the "70-80% success rate [which] meets the liberal standard for probable cause."  See Kennedy, 131 F.3d at 1378.

While defendant asserts that Mick's lapse in certification "destroys the dog's credibility," (def. mem. at 16), he ignores controlling case law that allows for success rates well below Mick's to support a finding of probable cause.  While active certification of Mick on December 30, 2011 would arguably strengthen the weight of the prosecutions evidence regarding the alert, the lack of certification is not a fatal flaw based on the documented record of the dog as set forth herein, and because of the Tenth Circuit's allowance of reliability evidence beyond simple certification.  Clarkson, 551 F.3d at 1204.

Defendant incorrectly asserts that Trooper Wood searched the gas tank on scene and argues failure to locate drugs in the tank negated Mick's alert.[8]  (Def. Mem. at 16-17.)  Nevertheless, although Mick's alert alone was sufficiently reliable to provide probable cause, see Klinginsmith, 25 F.3d at 1510, it was but one compelling factor among many that justified Trooper Wood searching defendant's truck as thoroughly as a magistrate could authorize by warrant.  See United States v. Ross, 456 U.S. 798 (1982).

During a search of defendant's truck at the service station, Trooper Wood observed further indications that convinced him there was a hidden compartment in the

---

[8] See Note 2 above.  The evidence before the Court demonstrates that Trooper Wood did not have a gas tank scope readily available and therefore elected to move defendant's truck to the service station for a more thorough inspection.

-26-

floor of the truck's cab.[9]  (Tr. at 45-47.)  Once he determined the compartment was

hidden in the transmission hump, Trooper Wood drilled holes in the area.  (Id. at 47.)

The first hole revealed a second piece of sheet metal under the floorboard, indicative of a

hidden compartment; the second hole missed the secondary sheet altogether, suggesting

even further that the additional layer of metal was highly unusual.  (Id. at 47-48.)  After a

vibration test that suggested the compartment was located closer to the rear of the cab,

Trooper Wood then drilled a third hole–this time further away from the dashboard and in

the opposite direction of the second hole.  (Id. at 48-50.)  This third hole revealed a large

hidden compartment containing ten kilogram-sized packages that tested positive for

cocaine.  (Id. at 50-52, 80.)  Trooper Wood later found "the compartment door was

disguised as an air bag sensor under the center of the front seats."  (Id. at 51-53.)  Trooper

Wood arrested Mr. Urias and transported him to jail.  (Id. at 79.)

　　　During the traffic stop–initiated after a tip from a fellow officer–Trooper Wood

noted a strong masking odor; vague, evasive, and even deceptive answers; a recently

registered vehicle; and a driver who was recently released from prison for drug trafficking

and who was being currently investigated for trafficking cocaine in Colorado.  Having

also observed numerous indications that the truck contained a hidden compartment in the

floor of the cab, Trooper Wood further requested deployment of a trained, reliable police

dog.  The dog gave a positive indication for the odor of narcotics on defendant's truck,

---

[9] These observations included additional marks on the undercarriage, bolts that were
ground off and repainted, and a fresh weld mark on the interior floorboard that had been partially
ground down and repainted.  (Tr. at 45-46.)  The weld was particularly suspicious, as it was in a
location that is "unheard of" and that had no purpose other than holding the hidden compartment
together.  (Id. at 46.)

and Trooper Wood then moved the truck to a service station for a more thorough inspection that revealed a large hidden compartment concealing cocaine.

In their totality, Trooper Wood's observations "indicate[d] a fair probability of criminal activity," see United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007), and established probable cause "to search the vehicle without a warrant under the automobile exception even had there been no prior consent." Klinginsmith, 25 F.3d at 1510 (emphasis added). Thus, Trooper Wood could lawfully search defendant's truck as thoroughly as a magistrate could authorize by warrant. See United States v. Ross, 456 U.S. 798 (1982).

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence, (file entry 17), be **DENIED.**

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within fourteen (14) days after receiving it. Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this 7th day of December, 2012.

BY THE COURT:

ROBERT T. BRAITHWAITE
United States Magistrate Judge